**Frank J. GAINES, Plaintiff-Appellant,**

v.

**CUNA MUTUAL INSURANCE SOCIETY, Defendant-Appellee.**

**No. 81–2223**
**Summary Calendar.**

United States Court of Appeals, Fifth Circuit.

Aug. 4, 1982.

Fred S. Abney, Dallas, Tex., for plaintiff-appellant.

M. Leigh Bartlett, Gerald R. Powell, Dallas, Tex., for defendant-appellee.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

At the conclusion of the plaintiff's case in this action for defamation and violation of the Texas Insurance Code[1] and the Texas Deceptive Trade Practices and Consumer Protection Act[2] the trial judge directed a verdict for the defendant because the communication alleged to be defamatory was, as a matter of law, privileged, there was no evidence of malice, and the provisions of the Insurance Code and the Deceptive Trade Practices Act relied upon were

---

1. Tex.Ins.Code art. 21.21 *et seq.* (Vernon 1981).

2. Tex.Bus. & Com.Code Ann. § 17.41 *et seq.* (Vernon Supp.1982).

not applicable to the conduct complained of.[3] Finding these conclusions correct, we affirm.

Frank J. Gaines was employed by CUNA Mutual Insurance Society as a district manager. CUNA offers a group life insurance plan to members of credit unions and their families. Members who make a deposit obtain life insurance on a group basis without medical examination in an amount equal to the deposit but not to exceed $2000. The insurance premium is paid by the credit union as part of its plan to encourage systematic savings. In 1978, Gaines, knowing that his mother was in poor health and unable to obtain insurance through normal channels, made deposits in two credit unions for the purpose of obtaining insurance coverage on his mother's life. Within eleven days thereafter, Gaines's mother died.

Because of the brief interval between the date of the deposits and the date of Mrs. Kearney's death, the claim was brought to the attention of the manager of one of the credit unions. The manager reviewed the claim, and then telephoned the CUNA home office in Madison, Wisconsin asking that the claim be reviewed because Gaines was an employee of CUNA. As part of the investigation, Leon Wagner, CUNA's First Vice President, sent a letter to Gaines requesting information about the deposits and about Gaines's mother. In the letter, Wagner commented on the apparent impropriety of Gaines's action and suspended him from his employment pending completion of the investigation. A copy of the letter was sent to four other CUNA officials. Gaines never returned to CUNA's employment and he contends that, as a result of the charges in the letter, he has since been unable to obtain a job in the insurance industry.

Texas law dictates the substantive rules to be applied in this diversity case, but the standard for a directed verdict is procedural, hence federal. That standard is the familiar one set forth in *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969). Considering all the evidence, a directed verdict shall be granted:

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury.

The record establishes beyond dispute that CUNA did not intend to provide insurance to cover those who could not obtain coverage elsewhere. Gaines stated at trial that he knew that this was not the purpose of the insurance. Gaines also was aware prior to obtaining insurance for his mother, of the existence of a problem of abuse of the insurance program. Many people would make deposits in the credit union account of an aging person merely for insurance purposes.

■■■ The circumstances surrounding the claim, together with the credit union manager's request, created a genuine business need to make an investigation, and from this need there arose a privilege for communications made in the course of the investigation.[4] *Ryder Truck Rentals, Inc.*

---

3. Any error committed by the court in granting the motion for a directed verdict regarding the claims based on the Insurance Code and the Deceptive Trade Practices Act has been waived by the failure of the plaintiff to brief these issues. The plaintiff stated in his brief filed in this court:

> The issues involved in this case are identified best by the law of defamation. Variants of the law of defamation are brought within

the ambit of the Texas Deceptive Trade Practices Act and the Texas Insurance Code by certain provisions thereof which Gaines claims that Cuna violated. However, the law of defamation furnishes the best framework for the analysis of the disputed issues involved in this case and Gaines adopts that framework for his argument herein.

4. In *Dixon v. Southwestern Bell Tel. Co.*, 607 S.W.2d 240, 242–43 (Tex.1980), the Texas Su-

*v. Latham,* 593 S.W.2d 334, 339 (Tex.Civ. App.—El Paso 1979, writ ref'd n.r.e.); *Duncantell v. Universal Life Ins. Co.,* 446 S.W.2d 934, 936 (Tex.Civ.App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.). The person who utters words that are defamatory is protected by a privilege for communications made to protect the publisher's interest or "with regard to which he has a duty to perform to another owing a corresponding duty." *Buck v. Savage,* 323 S.W.2d 363, 372 (Tex.Civ.App.—Houston 1959, writ ref'd n.r.e.); *accord, Goree v. Carnes,* 625 S.W.2d 380, 384 (Tex.App.—San Antonio 1981, no writ); *see McDowell v. Texas,* 465 F.2d 1342, 1344–45 (5th Cir. 1971) ("A qualified privilege attaches to statements which occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist which another, sharing that common interest, is entitled to know.") (applying Texas law), *cert. denied,* 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973). The privilege protects statements made by an employer concerning an employee. *Bergman v. Oshman's Sporting Goods, Inc.,* 594 S.W.2d 814, 816 (Tex.Civ.App.—Tyler 1980, no writ); *Butler v. Central Bank & Trust Co.,* 458 S.W.2d 510, 514–15 (Tex.Civ.App.—Dallas 1970, writ dism'd w.o.j.) (" 'Accusations against an employee by his employer or another employee made to a person having a corresponding interest or duty in the matter to which the communication relates are qualifiedly privileged.' ") (quoting 36 Tex.Jur.2d § 79, at 366); 1 F. Harper & F. James, The Law of Torts § 5.26, at 443–44 (1956).

The protection is based on a public policy that recognizes the need for the free communication of information to protect business and personal interests. To encourage open communication, it is necessary to afford protection from liability for misinformation given in an appropriate effort to protect or advance the interests involved.

Restatement (Second) of Torts, Scope Note preceding § 593 (1977). Such a privilege is, however, conditional or qualified, "because a person availing himself of it must use it in a lawful manner and for a lawful purpose. The effect of the privilege is to justify the communication when it is made without actual malice." *Buck v. Savage, supra* at 372; *see* Restatement (Second) of Torts, *supra* § 593.

■ Gaines contends the privilege was abused by publication of Wagner's letter to persons who had no interest or duty in the subject of the investigation and by including comments in it that did not have a reasonable bearing on the investigation. *Id.* § 599. Publication to a person who does not share in the scope of the investigation or who has no need to share in the information is not protected by the privilege. *Id.* § 605. Nor is a communication privileged if it includes matter not embraced by the privilege. *Id.* § 605A.

■ Carbon copies of the letter from Wagner to Gaines were sent to Messrs. Curry, Uphoff, Whipple and Ruth. Robert L. Curry was President of CUNA Mutual Insurance Society, and directed that the investigation be undertaken. Richard J. Uphoff was Vice President of CUNA's Contract Services, a department with responsibility for handling claims. Gerald W. Whipple was Vice President of CUNA Group Coverages, the department in charge of the specific type of insurance involved in this lawsuit. John J. Ruth was Vice President of the CUNA Southern Region, reported directly to Mr. Whipple, and was Mr. Gaines's boss. All four men had an interest in an investigation relating to possible wrongdoing by a CUNA employee. Communication to all of them, therefore, was within the scope of the qualified privilege.

■ Gaines also contends that secretaries necessarily received copies of the letter, and that they fall outside the protection of the

preme Court recently held that the question of privilege is neither always one of law for the court nor always one of fact for the jury. Rather, when the facts upon which the privi-

lege is based are conclusively proved by the evidence, then the qualified or conditional privilege may be found to exist as a matter of law.

privilege. There is no direct evidence that any secretary saw the letter from Mr. Wagner to Mr. Gaines. More important, communication to confidential secretaries who type or receive mail in the normal course of business is protected by the privilege. 1 F. Harper & F. James, *supra*, § 5.27, at 456 ("[A] business communication made on a privileged occasion will not render a defendant liable because of publication by the author of the communication to a clerk or stenographer, nor, for the same reason, because it is read by a clerk or secretary of the communicant.") (footnotes omitted); Restatement (Second) of Torts, *supra* § 604, comment b.[5]

▇ Gaines contends that the contents of the letter exceed the proper scope of the privilege. His claim is without merit, however, for all of the inquiries in the letter were legitimately related to the investigation into possible abuse of the insurance program.[6]

▇ Gaines also alleges that the letter was published maliciously and that the question of malice[7] was for the jury. While malicious publication is unprotected, the burden of proof of malice is on the asserter. *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex.1970); *see Denton Publishing Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex.1970). In this case, Gaines did not produce sufficient evidence of actual malice to raise a fact issue.

▇ In a case brought by a private individual against a non-media defendant, the weight of Texas authority holds that the standard for proof of actual malice in a conditional privilege case is that enunciated in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706 (1964). *Dun and Bradstreet*, 456 S.W.2d at 900–01; *Roegelein Provision Co. v. Mayen*, 566 S.W.2d 1, 11 (Tex.Civ.App.— San Antonio 1978, writ ref'd n.r.e.). Under *New York Times*, there is actual malice if the speaker had actual knowledge that the statement was false, or if the statement was made with reckless disregard of whether it was false or not. Mere negligence as to falsity is insufficient to overcome the conditional privilege. *Ryder Truck Rentals*, 593 S.W.2d at 340.

Gaines asserts there was sufficient evidence of actual malice to raise a fact issue. First, Gaines contends that, because his employment with CUNA was "at the will of his employer" there was no reason for CUNA to write the "derogatory" letter. Rather, CUNA should have just fired Gaines. Although it is true that CUNA could have merely terminated Gaines without question, a reasonable inference may be drawn that CUNA was attempting to give Gaines a chance to explain himself and thereby retain his job. If anything, this inference indicates good faith on the part of CUNA.[8]

Gaines also contends that because the manager of the Richardson Credit Union

---

**5.** *Cf.* W. Prosser, Handbook of the Law of Torts § 113, at 767 (4th ed. 1971) ("The dictation of defamatory matter to a stenographer generally is regarded as sufficient *publication*, although it may be privileged.") (emphasis added).

**6.** Gaines asserts that the inquiries as to how his mother obtained membership in the credit union, his mother's illness, and the source of the funds deposited went beyond the scope of privilege.

**7.** Harper and James offer a definition of the legal conception of malice:

It must be some motive inconsistent with the social policy which gives rise to privilege and which affords prima facie immunity to the defendant. If it appears that the defendant has attempted to use the circumstances and

the occasion for a purpose not within that for which the immunity is extended, the privilege is abused and he is liable.

1 F. Harper & F. James, *supra* § 5.27, at 452.

**8.** Furthermore, there is no evidence that, as contended by Gaines, CUNA intentionally "circulated [the letter] among everyone that [Gaines] might name as a reference on a subsequent employment application." There is no evidence that CUNA intentionally "blackballed" Gaines in the insurance industry. There is no evidence that this letter of inquiry was a "massive overkill" intended to destroy Gaines's reputation. There is no even any evidence in the record from which such intentions could reasonably be inferred.

was dissatisfied with the premium rate on the life savings plan, CUNA sacrificed Gaines in order to appease the manager and sell him a modified insurance plan. There is no evidence, however, to support this theory. Rather, the evidence supports the conclusion that CUNA and the credit union manager were genuinely concerned with the apparent abuse of the insurance plan by a CUNA official.

Gaines also complains that the fact that CUNA officials did not telephone him to discuss the problem before sending the letter constitutes evidence of actual malice. The failure to investigate the truth of a privileged communication does not by itself constitute evidence of malice, *Dun and Bradstreet*, 456 S.W.2d at 901; *El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969), and is not inconsistent with the defendant's good faith so as to justify a legal inference of malice, *Cheatwood v. Jackson*, 460 S.W.2d 528, 530 (Tex.Civ.App.—Houston [14th Dist.] 1970, no writ). CUNA was attempting only to allow Gaines to respond. The fact that the communication was written rather than oral constitutes no evidence of malice.

Finally, Gaines urges that there is a "disparity of the economic considerations involved." Gaines contends that the maximum loss because of the claims could have only been two thousand dollars, yet "Cuna was willing to sacrifice the good name and career of a man who had served them loyally for thirteen years." This argument begs the question. If there was evidence that CUNA did indeed willingly sacrifice Mr. Gaines, then that would be the evidence of malice. There is, however, no such evidence in this record.

The overwhelming weight of the evidence establishes that CUNA was making a good faith investigation into the conduct of Mr. Gaines, pursuant to a request for that investigation by the Richardson Credit Union. The record clearly establishes the possibility of an abuse of the insurance plan. Gaines admitted that he deposited the money in the credit union account solely for the purpose of obtaining insurance, and that, when he made the deposit, he knew that his mother was not insurable in the open market. The account was opened a short period before the death of his mother. The claim filed by Gaines after his mother's death stated that the last day of good health for his mother was January 26, 1978, despite the fact that she had been in the hospital for some time prior to that. Mr. Wagner merely gave Mr. Gaines a full opportunity to explain his conduct. Under these circumstances, the trial court was correct in its conclusion that the letter was within the scope of a qualified privilege and that there was no evidence of actual malice under the *New York Times* standard.

For these reasons, the judgement is AFFIRMED.